Filed 5/24/24  Republic Metropolitan v. City of Santa Clara CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| REPUBLIC METROPOLITAN LLC,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CITY OF SANTA CLARA,<br><br>    Defendant and Respondent. | H050805<br>(Santa Clara County<br> Super. Ct. No. 22CV393667) |

Plaintiff Republic Metropolitan LLC (ReMet) sued defendant City of Santa Clara for abruptly terminating negotiations on a development project, claiming that the cessation of negotiations breached the express and implied terms of an Exclusive Negotiation Agreement (exclusivity agreement).  In sustaining the City's demurrer without leave to amend and entering judgment for the City, the trial court relied on the expiration of the exclusivity agreement months before the City stopped negotiating.  Although ReMet contends that expiration of the exclusivity agreement is nullified by waiver or equitable estoppel, given the parties' course of performance, ReMet has neither pleaded nor suggested an ability to plead facts sufficient to invoke those doctrines.  We affirm.

## I.  BACKGROUND

In the operative first amended complaint, ReMet alleged the following:

ReMet proposed to develop two adjacent plots of land, owned by the City and the Valley Transportation Authority (VTA) respectively, for high-density housing and other amenities near a train station and a university. ReMet's proposed development "promised to generate nearly $1 billion in economic benefits."

ReMet began exploring the project in 2016. In 2017, ReMet initiated negotiations with the City and VTA concerning the exclusivity agreement. The parties entered the exclusivity agreement in February 2018.

The exclusivity agreement required " 'Good Faith Negotiations' " for 12 months, renewable for up to six months. The City and VTA were prohibited from negotiating with any entity other than ReMet regarding development of the property during the negotiating period. In exchange, ReMet deposited $50,000, advanced the project, and made regular reports. The exclusivity agreement did "not obligate the Parties to enter into . . . any further agreement."

To exercise the initial six-month extension, ReMet needed to submit a written request with a schedule of tasks to be accomplished in the extended period. The City Manager was granted discretion to approve the initial extension. Any further extensions of the negotiating period were to "require formal amendment of this Agreement executed by the City, VTA, and [ReMet]."

In February 2019, the parties amended the exclusivity agreement by exercising the option to extend the negotiating term for six months. The amendment modified the exclusivity agreement to provide that "[a]ny further extensions or modifications of the Negotiating Period will require formal amendment of this Agreement approved by the City Council and executed by the City, VTA, and [ReMet]." The amendment was signed two days after the original 12-month negotiating period expired. The parties continued making progress on the project in the two intervening days.

In July 2019, the City Council voted unanimously to authorize a second amendment extending the negotiating period. Although the February 2019 extension

expired in August 2019, the parties executed the second amendment in December 2019. Between August and December 2019, the parties continued to advance the project.

The second amendment formally extended negotiations through August 5, 2020. As further amended, the exclusivity agreement provided that "[a]ny further extensions or modification of the Negotiating Period will require formal amendment of this Agreement approved by the City Council . . . [and] the VTA Board of Directors in their complete discretion and executed by the City, VTA, and the Developer."

In July 2020, the City Council voted unanimously to authorize a further extension of the exclusivity agreement. In the following months, the three parties continued to move the project forward, including after the expiration of the negotiating period set forth in the second amendment. However, the parties never executed an amendment formalizing this further extension.

In October 2020, the City Council voted in closed session to terminate the project. "Right up until the final day before [the] unlawful vote, [ReMet] and the [City] were working collaboratively" on the project. "The messaging by the [City] was to that point wholly . . . aligned with an agreement to be bound by the [exclusivity agreement] and an intention to move forward with the project." Termination meant that despite "[t]housands upon thousands of hours spent, millions and millions of dollars invested, untold taxpayer dollars wasted," the project failed.

Among other theories, ReMet alleged that the City breached the exclusivity agreement and the agreement's implied covenant of good faith and fair dealing by terminating negotiations in October 2020. As a result, ReMet lost its investment after providing its proprietary information to the City.

Having sustained the City's demurrer to ReMet's original complaint, the trial court sustained the City's demurrer to ReMet's first amended complaint without leave to amend and entered a judgment of dismissal from which ReMet timely appealed.[1]

## II.  DISCUSSION

ReMet's appeal turns on whether the City's obligation to negotiate with ReMet in good faith under the exclusivity agreement terminated on August 5, 2020, before the City broke off negotiations.  Under the exclusivity agreement's plain language, the City's obligation terminated on that date.  ReMet contends that the plain language does not control, asserting that the City Council vote to extend the exclusivity agreement and the parties' course of performance operated as a waiver or estoppel.  Because ReMet is unable to plead facts that could support a finding of waiver or estoppel that effectively modifies the exclusivity agreement by extending the negotiating period, we apply the exclusivity agreement's terms and affirm.

### A.    *Standard of Review*

"In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory."  (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162.) In the exercise of our independent judgment, "we accept the truth of material facts properly pleaded in the operative complaint, but not contentions, deductions, or conclusions of fact or law. We may also consider matters subject to judicial notice." (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924 (*Yvanova*).)  When a demurrer is sustained without leave to amend, "we decide whether there is a reasonable possibility that the defect can be cured by amendment," but "[t]he burden of proving such

---

[1] The parties' joint motion to augment the record with the amended judgment reflecting an award of attorney fees is granted.

4

reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)

ReMet repeatedly argued in its briefing that we should reverse because, in ReMet's view, the trial court's written order contained analytical flaws and failed to address some of ReMet's legal arguments. This misapprehends the nature of our independent review. We review the judgment, not the trial court's reasoning, and "must affirm . . . if any of the grounds stated in the demurrer is well taken." (*Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 111; see also *Rossi v. Sequoia Union Elementary School* (2023) 94 Cal.App.5th 974, 985; *Brinsmead v. Elk Grove Unified School Dist.* (2023) 95 Cal.App.5th 583, 587 ["We affirm if any proper ground for sustaining the demurrer exists even if the trial court did so on an improper ground"].)

**B.** *Termination Date*

ReMet has shown no ability to plead facts that support its claims that (1) the negotiating period under the exclusivity agreement was extended past August 5, 2020; or (2) the City waived, or is estopped from raising, the termination of the negotiating period as a defense to claims under the exclusivity agreement.

**1.** *The Plain Language of the Exclusivity Agreement*

" 'Contract interpretation presents a question of law which this court determines independently.' [Citation.] ' " 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties.' [Citation.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] 'If contractual language is clear and explicit, it governs.' " ' " (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1340.)

ReMet does not and cannot allege that the parties agreed—in the manner required by the exclusivity agreement—to extend the agreement's termination date past August 5, 2020. The second amendment, which formally extended the negotiating period through

5

August 5, provided that any further extension of the negotiating period "will require formal amendment of this Agreement approved by the City Council, the VTA Board of Directors in their complete discretion and executed by the City, VTA, and the Developer." ReMet makes no argument that this requirement of a duly executed formal amendment was ever satisfied.

As modified by the second amendment, the exclusivity agreement "shall terminate" if the negotiating period expired without execution of a draft disposition agreement or lease option agreement, "and no party will have any further rights or obligations" under the exclusivity agreement, except listed rights or obligations not implicated here.[2] Under the plain terms of the exclusivity agreement the City's contractual obligation to negotiate with ReMet in good faith terminated on August 5, 2020.

**2.** *Course of Performance, Waiver, and Estoppel*

ReMet contends that the City, by its course of performance, waived the right to enforce the exclusivity agreement's termination date, and thus continued to be bound by the exclusivity agreement after its termination. ReMet would have us discern waiver in that (1) the City Council voted to extend the exclusivity agreement a third time while it remained in effect; (2) with prior expiration dates, the parties had proceeded as if the exclusivity agreement were still in effect between the City Council's approval of those extensions and the formal execution of extension agreements; and (3) the City "continu[ed] to work toward a final term sheet" after August 5, 2020, until the City terminated negotiations. Alternatively, ReMet contends these same reasons support

---

[2] ReMet seems to suggest that we should read the exclusivity agreement as though it has no termination date, on the ground that the parties' ultimate goal was to enter a disposition agreement. We cannot reconcile this suggestion with ReMet's appropriate concession that the exclusivity agreement commits neither party to enter a disposition agreement.

equitably estopping the City from enforcing the termination date.  We reject ReMet's contentions because ReMet has not alleged facts that would establish any of the City's conduct conflicted with its position that the exclusivity agreement terminated on August 5, 2020,[3] when there was never an amendment approved by the City Council and executed by the parties.

" 'Waiver requires the intentional relinquishment of a known right upon knowledge of the facts.' " (*Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 504.)  "The intention may be express, based on the waiving party's words, or implied, based on conduct that is ' "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' " (*California-American Water Co. v. Marina Coast Water Dist.* (2022) 86 Cal.App.5th 1272, 1292 (*California-American*).)  Waiver may be decided as a matter of law where the relevant facts are undisputed.  (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1191.)

Estoppel, on the other hand, " 'generally requires a showing that a party's words or acts have induced detrimental reliance by the opposing party.' " (*California-American*, *supra*, 86 Cal.App.5th at p. 1292.)  Equitable estoppel typically requires that " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be . . . acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must [reasonably] rely upon the conduct to his injury.' " (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1359; see *id.* at p. 1368.)

---

[3] ReMet contends that the trial court was required to accept its "theory" that the City's conduct after August 5 extended the contract and that the court erred by failing to "credit these allegations."  In evaluating a demurrer, courts accept the truth of well-pleaded material facts, not the soundness of a plaintiff's legal theories.  (See *Yvanova*, *supra*, 62 Cal.4th at p. 924.)

7

"Although estoppel is generally a question of fact, where the facts are undisputed and only one reasonable conclusion can be drawn from them, whether estoppel applies is a question of law." (*Id*. at p. 1360.)

Contracting parties' course of performance may " 'show a waiver or modification of any term inconsistent with the course of performance.' " (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 921 (*Employers Reinsurance*); see also *Baker v. Curtis* (1951) 105 Cal.App.2d 663, 669–670 (*Baker*) [holding that property owner was required to pay broker commission under contract where property owner waived time limitation in contract by urging and encouraging the broker to continue his efforts to find a purchaser for the property after the time limit expired]; *Kraemer v. Smith* (1960) 179 Cal.App.2d 52, 55–57 (*Kraemer*) [affirming award of broker commission where property owners refused to extend broker's contract after encouraging broker's continued efforts, post-expiration, culminating in sale].)[4]

Because ReMet stops short of alleging that the City expressly waived the contractual requirement that any extension of the exclusivity agreement past August 5, 2020 be formally approved and executed, ReMet may be relying on implied waiver, or equitable estoppel. Each of these theories depends on ReMet establishing City conduct inconsistent with the express terms of the contract governing the extension of the termination date. But ReMet has not alleged facts showing inconsistency.

First, the contract plainly treated approval by the City Council and execution by the City as two distinct requirements. We accept as true ReMet's allegation that the City Council voted to approve the third amendment and extension of the exclusivity

---

[4] Although course of performance evidence may reveal a latent ambiguity or assist in interpreting an ambiguous contract (*Employers Reinsurance*, *supra*, 161 Cal.App.4th at p. 920), we understand ReMet's position to be that the parties' course of performance demonstrates a waiver or modification of the unambiguous termination date. The parties' course of performance does not render the plain language of the contract ambiguous in material part.

8

agreement, despite ReMet's seeming concession that the City Council conditioned its approval on terms ReMet had not met. But meeting the first requirement—approval by the City Council—does not waive the others—including execution of a formal amendment. So the City's taking the first step necessary to extend the notice period is not inconsistent with its right to insist on the second necessary step. Similarly, ReMet could not reasonably rely on the City Council vote as independently extending the negotiating period without execution of a formal amendment. The City Council's approval of a third extension does not support an implied waiver or equitable estoppel.

Second, ReMet has not pled facts that would show any of the City's conduct advancing the project during the exclusivity agreement or after the ultimate termination date was inconsistent with its position that the exclusivity agreement terminated on August 5, 2020.

Addressing the extended period between the termination date in the first amendment and the execution of the second amendment, ReMet alleged that "continued participation in project planning and operations advancing the project . . . waive[d] . . . any termination right[s]" because declining to terminate "negotiations . . . communicated" that the City was still bound by the exclusivity agreement. Similarly, ReMet alleges various steps the City took after August 5, 2020, that were consistent with continuation of the exclusivity agreement, such that ReMet understood the City to be bound by the exclusivity agreement.

The question, however, is not whether the City's conduct was consistent with the exclusivity agreement but whether the City's conduct was inconsistent with its contention that the exclusivity agreement terminated. ReMet has not alleged that the City could only engage in any of its alleged conduct—i.e., continuing negotiations and advancing the project—if the exclusivity agreement was in effect. ReMet has not alleged that the City purported to exercise any contractual right or encourage performance under the contract after August 5, 2020. (Cf. *Baker*, *supra*, 105 Cal.App.2d at pp. 669–670; *Kraemer*,

9

*supra*, 179 Cal.App.2d at p. 57.) Nor has ReMet alleged the ultimate conclusion that the City's conduct was *inconsistent* with its enforcement of the contractual requirement that further extensions of the negotiating period be in a formal amendment executed by all parties.

ReMet argues in its appellate brief that the City's post-expiration conduct was "inconsistent with any notion of a suspension or cessation of *the relationship*." (Italics added.) Nothing in the record suggests that the exclusivity agreement was necessary for the parties to have a negotiating "relationship," even an exclusive and good faith negotiating agreement. The point of the exclusivity agreement was to secure a *commitment* to negotiate exclusively and in good faith *for a specified period*. The City could voluntarily decide to negotiate with ReMet without an exclusivity agreement— there is nothing inconsistent in its electing to negotiate with ReMet while maintaining that it did not have to. (See generally *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251, 1260, fn. omitted (*Copeland*) [explaining that "neither party has any obligation to continue negotiating or to negotiate in good faith" simply because they "engage in negotiations to form or modify a contract"].) Indeed, ReMet conceded at oral argument that "[t]he City is permitted to negotiate without an exclusive negotiating agreement." With no inconsistency between ongoing negotiations and the expiration of the exclusivity agreement, ReMet could not reasonably rely on the City's decision to continue negotiating as an indication that the exclusivity agreement remained in effect.

ReMet's emphasis on *Kraemer* is misplaced. There, property owners were bound to pay a real estate broker a commission for the sale of a property under an expired contract because they encouraged the broker to continue providing services under the contract and the broker's continued efforts bore fruit after expiration. (*Kraemer*, *supra*, 179 Cal.App.2d at pp. 55–57.) The *Kraemer* court explained that, post-expiration, the property owners could have ended their contractual relationship with the broker at any time before the broker's production of a purchaser; the contractual relationship remained

in effect only for so long as the property owners encouraged the broker to continue providing services and the broker complied. (*Id.* at pp. 56–57.) The upshot is that a property seller cannot encourage a broker to disregard the expiration date in the contract until the broker successfully completes their performance and produces the purchaser, only to then deny the broker's contractual payment for the completed service.

The *Kraemer* court's analysis cannot be transposed to this case. The City did not contract to pay ReMet for a service; the parties agreed to negotiate exclusively and in good faith terms for a future development contract.[5] In this context, negotiating is not by itself inconsistent with the expiration of the exclusivity agreement. Moreover, the *Kraemer* court's reasoning had an important backstop, the seller could end the contractual relationship at any time after the expiration date prior to the broker's production of a purchaser. ReMet would have us remove this backstop: If the City's decision to stop negotiating were a breach of contract, then the City would lack the right to terminate the contract at will until the contract's ultimate object was achieved, a right which the *Kraemer* decision preserved for both parties. ReMet's extension of *Kraemer* here would be more like requiring a broker who has continued marketing a property after expiration to continue those efforts until the property is sold, or else indefinitely.

In response to our invitation to explain how any of the City's alleged conduct was inconsistent with the lapse of the exclusivity agreement, ReMet argues that it "alleged ample City actions inconsistent with the [exclusivity agreement] having expired and constituting express confirmation that it had not."[6] But ReMet identifies no such allegations. It points out that the City "set a meeting for Project Clearance Committee

---

[5] What money did change hands went from ReMet to the City before the exclusivity agreement ultimately expired—ReMet was required to submit "negotiation deposits" the City "may use . . . to reimburse any costs associated with the Project."

[6] ReMet moved to strike the City's simultaneous supplemental brief as nonconforming, a motion we deny.

11

review, the final approval phase," without explaining how that act was inconsistent with mere voluntary negotiations from which the City could withdraw at any time. Indeed, ReMet next disclaims any argument that "all negotiations are inconsistent with the [exclusivity agreement] having expired." The defect in ReMet's reliance on the City' post-termination negotiations is ReMet's failure to offer reasoned argument or authority limiting the City's freedom to negotiate in the absence of any exclusivity agreement.

Third, the City's past approach to amendments is not inconsistent with its position that the exclusivity agreement required further extensions be executed by all parties. The City Council had approved an earlier extension before the negotiating period expired, then executed the amendment with the City Attorney's approval after the negotiating period expired, without any intervening break in negotiations. But the ultimate execution of amendments extending the negotiating period suggests that execution of the amendment was necessary to extend the exclusivity agreement, not that a city council vote rendered execution superfluous. ReMet could not reasonably rely on this past conduct to indicate that execution of an amendment was unnecessary. The City's past approach to amendments does not support an implied waiver or equitable estoppel theory.

The City's conduct and the parties' course of performance, taken together, do not support a theory of implied waiver or equitable estoppel.[7] At bottom, ReMet's factual allegations are deficient because they do not support an inference that the City's conduct

---

[7] ReMet conceded at oral argument that the City could "theoretically" have conducted all of its negotiations with ReMet without an exclusivity agreement. ReMet argued, however, that the totality of circumstances manifested the City's intention to remain bound by an exclusivity agreement the City did not need—the City's initial execution of that agreement, its enjoyment of ReMet's work product under the agreement, the council vote to conditionally extend the agreement, the City's past willingness to negotiate between expiration and formal extension of the agreement, and the City's continued negotiations this time. But none of these facts, in isolation, is inconsistent with the City's contention that the exclusivity agreement terminated on its expiration date and was not thereafter extended. Nor is their confluence.

12

was inconsistent with its position that the exclusivity agreement terminated on August 5, 2020 under the express terms of the contract. We do not reach the City's contention that it was not permitted to waive or otherwise modify the termination date in the exclusivity agreement without executing a formal amendment.[8]

## C.      *Breach of Contract and Implied Covenant*

ReMet pleads two theories predicated on the City's obligations under the exclusivity agreement—the City allegedly breached the express provisions of the exclusivity agreement and the covenant of good faith and fair dealing implied in the exclusivity agreement. (See generally *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 371 [covenant of good faith and fair dealing implied in every contract].) These theories fail because they ultimately depend on the pertinent terms of the exclusivity agreement continuing past its expiration through the date of the alleged breaches. (See generally *San Bernardino Public Employees Assn. v. City of Fontana* (1998) 67 Cal.App.4th 1215, 1223 [after memoranda of understanding implementing collective bargaining agreements expired, employees had no legitimate expectation that longevity-based benefits provided for by the expired agreements would continue unless they were renegotiated as part of a new agreement]; *Rutledge v. Hewlett-Packard Co.* (2015) 238 Cal.App.4th 1164, 1181–1182 [applying one-year warranty period to bar claim].) ReMet has not adequately pleaded an alternative breach of the contract or the implied covenant preceding the expiration of the exclusivity agreement.

---

[8] The City requests judicial notice of its charter in support of its argument that it may contract only in writing, such that amendments to the exclusivity agreement must also be in writing. Because we do not reach the issue, we deny the City's request for judicial notice as moot. (See, e.g., *Miller v. Zurich American Ins. Co.* (2019) 41 Cal.App.5th 247, 255, fn. 5 ["Because the documents are not necessary to resolve the issues before us, we deny the request for judicial notice as moot"].)

ReMet has pleaded seven theories of breach: (1) The City refused to negotiate a final disposition agreement and lease option agreement in good faith; (2) The City Attorney and City staff advised the City Council to impose conditions on the grant of a third extension of the exclusivity agreement; (3) On false pretenses, the City Attorney and City staff advised the City Council to withdraw from the exclusivity agreement and terminate the ReMet project; (4) The City Council voted to terminate the ReMet project in closed session; (5) The City Attorney and City staff presented recommendations in that closed session; (6) City staff sent a letter withdrawing from and terminating the exclusivity agreement and the City's participation in the ReMet project; and (7) The City Attorney and City staff provided inaccurate information to the City Council regarding reconsideration of the decision to withdraw from and terminate the exclusivity agreement and the ReMet project.

At least five of ReMet's theories of breach, numbers (1) and (4) through (7), are not viable because they depend on the exclusivity agreement's continued vitality after August 5, 2020. ReMet alleged that the City continued to engage in negotiations and move the project forward until October 2020, giving ReMet the impression that the exclusivity agreement remained in effect. In October 2020, the City Council voted in closed session to terminate the project. The City sent its letter notifying ReMet that it had ceased efforts to further ReMet's proposed development project in November 2020.[9] ReMet's ill-fated attempts to secure reconsideration occurred even later. Thus, the theories based on the City's termination of negotiations and the project, advice given in connection with the October 2020 meeting, the November 2020 letter, and subsequent

_____

[9] Whether the City withdrew from the exclusivity agreement, as ReMet alleges, is a legal conclusion, not a material fact. The City in its letter and onward maintained that the exclusivity agreement had expired on August 5, 2020. ReMet maintains that the exclusivity agreement remained effective after that date. The City cannot be said to have withdrawn from the exclusivity agreement unless the agreement continued to require negotiations beyond August 5, 2020.

14

reconsideration efforts are all founded on alleged breaches of a duty to negotiate with ReMet after that obligation expired in August 2020.[10]

ReMet does not explain its remaining two theories of breach other than to assert a duty to negotiate in good faith that survived the exclusivity agreement's August 2020 expiration. Particularly in this posture, ReMet has not shown that its remaining theories of breach are viable.

First, we will assume that ReMet's internal advice theory—that the City was advised to withdraw from the exclusivity agreement and terminate the project—involves advice given before the termination date.[11] If the City Attorney or other staff advised the City Council before August 5, 2020, to withdraw from negotiations, there is no allegation that such advice bore fruit before that date. We are not prepared to hold that mere internal debate, short of action by the decisionmaker, breaches a contractual obligation to negotiate in good faith. (Cf. *Copeland*, *supra*, 96 Cal.App.4th at pp. 1254, 1256, 1262–1263 [recognizing the potential availability of cause of action for breach of agreement to negotiate, upon a party's actual termination of negotiations].)

Second, ReMet's final theory that the City improperly imposed preconditions on a third extension of the exclusivity agreement does not state a claim for relief.[12] Nothing in

---

[10] The California Housing Defense Fund and the Bay Area Council—both represented by ReMet's counsel—submitted an amicus brief expressing their dismay that the trial court "ratified the City's abrupt and unilateral decision terminating . . . well-advanced negotiations over" a project that would have generated affordable housing proximate to public transportation. We express no view as to the wisdom of the proposed development or the City's decision to withdraw from negotiations. Our focus is instead on whether the City abided its contractual commitments, including its obligations implied in the contract.

[11] ReMet alleges that the City Attorney opposed the project from its inception and began trying to undermine the project in 2019.

[12] As alleged in the first amended complaint, internal recommendations advising the City to impose preconditions on the third extension in themselves violated the contract and the implied covenant. To the extent such recommendations were not acted

15

the contract supports an express or implied theory that the exclusivity agreement in any way constrained the City's discretion to reject or conditionally approve a further extension of the negotiating period. The express contractual duty to negotiate in good faith pertained to negotiation of a disposition agreement during the negotiating period, not to further extension of the exclusivity agreement. And the exclusivity agreement expressly provided that it did not obligate the parties to enter any further agreement. Accordingly, there was no implied duty to negotiate an extension of the exclusivity agreement. (See *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 554 ["implied covenant cannot . . . 'impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement' "].) Further, the final amendment to the exclusivity agreement provided that further extensions would require a formal amendment "approved by the City Council . . . [and] the VTA Board of Directors in their complete discretion." The contract, including the implied covenant, simply does not constrain the City in its consideration of a further extension. The City's refusal to extend the exclusivity agreement unless certain conditions were met is thus not a breach of the exclusivity agreement or the implied covenant.[13]

ReMet also contends that it should be given leave to amend to "shore up any ambiguities in the theories" it argued on appeal. But ReMet has not shown that it can cure the deficiencies in its pleading by alleging either (1) a violation of the exclusivity agreement or the implied covenant before August 5, 2020; or (2) facts supporting a continuing duty to negotiate in good faith after that date, whether by waiver, estoppel, or

---

on, they would not appear to be any more than ineffective expressions of internal dissent. But the parties in their briefing agree that the City did impose preconditions on a further extension—although they disagree as to whether it was permitted to do so and whether fulfillment of those conditions was accomplished or excused.

[13] We do not reach ReMet's contentions regarding specific performance and the exclusivity agreement's limitation on remedies. ReMet cannot state contractual claims, so we need not discuss the remedies that could be available in the event of a breach.

some other doctrine.  Accordingly, we discern no abuse of discretion in the trial court's denial of leave to amend.  (See *Blank*, *supra*, 39 Cal.3d at p. 318 [burden].)

### III.  DISPOSITION

The judgment is affirmed.

_____

LIE, J.


WE CONCUR:




_____

GREENWOOD, P. J.




_____

ADAMS, J.*




*Republic Metropolitan LLC v. City of Santa Clara*
H050805

---

*Judge of the Santa Clara County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.